## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 01 2020, 10:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Alan Karenke,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 1, 2020

Court of Appeals Case No.
19A-CR-1194

Appeal from the Jackson Circuit Court

The Honorable Richard W. Poynter, Judge

Trial Court Cause No.
36C01-1703-F3-3

**Mathias, Judge.**

[1]     Following a bench trial in the Jackson Circuit Court, Alan Karenke was convicted of Level 3 felony attempted rape, Level 6 felony criminal

confinement, and Class A misdemeanor resisting law enforcement. He was sentenced to nine years in the Department of Correction ("DOC"), with four years suspended to probation. Karenke's appeal presents a number of issues, which we reorder and restate as follows:

I.      Whether Karenke was denied his constitutional right to a jury trial and to confront witnesses;

II.     Whether the trial court abused its discretion on a number of evidentiary issues;

III.    Whether the evidence was insufficient to support Karenke's convictions;

IV.     Whether Karenke's conviction for confinement violated the constitutional prohibition against double jeopardy; and

V.      Whether Karenke's sentence was inappropriate in light of the nature of his offenses and his character as an offender.

We affirm.

## Facts and Procedural History

In spring 2017, eighteen-year-old T.P. lived in rural Jackson County with her mother, Brenda Karenke; two younger brothers; and stepfather, Karenke. The night of March 19, T.P. and her boyfriend, Tyler Hafner, were in contact via Facebook Messenger and text messages. Around 9:45 p.m., T.P. told Hafner she was going to sleep. Around midnight, Karenke entered T.P.'s room while

she slept. He pulled T.P.'s leggings and underwear off of one of her legs and performed oral sex on T.P. The assault was brief, and Karenke stopped when T.P. reached for her cellphone and illuminated its screen.

[4] T.P.'s next messages to Hafner were sent after midnight, in the early hours of March 20. T.P. told Hafner that she had woken up to see Karenke in her room with his head between her legs. She asked Hafner whether oral sex was considered rape. T.P. told Hafner that Karenke was trying to take her phone away and turn her phone's data service off. Hafner urged T.P. to leave the house and call the police. She was reluctant to do so, and Hafner went to his parents who called 911 on T.P.'s behalf.

[5] Law enforcement officers with the Jackson County Sheriff's Department responded to the house around 1:00 a.m. on March 20. Karenke answered the door when Officer Jesse Hutchinson knocked; Officer Hutchinson informed Karenke why he was there, but Karenke refused to come outside. A stand-off ensued, lasting over an hour, during which time officers "[took] up positions around the house" and urged Karenke to come outside. Bench Trial Tr. p. 52. At one point, Brenda came outside and helped officers communicate with Karenke via cellphone. Eventually, Karenke was tasered through an open window, briefly fell to the ground, and finally came outside onto the front porch, where he was arrested.

[6] While Karenke was refusing to come outside, Officer Hutchinson walked around the perimeter of the home and discovered a frightened T.P. "with her

head sticking out the window." *Id.* at 49. Officer Hutchinson pulled T.P. out through the window and had her wait in his patrol car. He left her alone while he rejoined the effort to arrest Karenke. During this time, T.P. continued texting with her boyfriend, Hafner. Once Karenke was detained, Officer Hutchinson returned to the vehicle and recorded a video interview with T.P. He later described T.P.'s demeanor during this time as "reserved" and "in a state of shock." *Id.* at 59.

Around 3:00 a.m., T.P.'s mother drove her to the Schneck Medical Center in Seymour, Indiana, for a sexual assault exam. T.P. told medical staff that she "woke to [Karenke] giving her oral sex[.]" *Id.* at 100. Medical staff completed a vaginal exam and collected vaginal and anal swabs, in addition to collecting samples from T.P.'s underwear. The samples obtained from T.P.'s underwear contained male DNA consistent with Karenke's paternal line, but whether the DNA belonged to Karenke was not confirmed by testing.

On March 21, 2017, the State charged Karenke with rape, a Level 3 felony; criminal confinement, a Level 6 felony; and resisting law enforcement, a Class A misdemeanor. Later the same day, the State amended the information to add charges of robbery, a Level 5 felony, and interference with the reporting of a crime, a Class A misdemeanor. At some point during the discovery process, the State received a signed, handwritten statement from T.P. that read as follows:

> I [T.P.] want to write this statement. Alan Karenke did not rape me. I was awake when Alan came into my room. I didn't say no or to stop. I was curious to what he was going to do. When I put

> my light on phone [sic] he stopped and said he was in the wrong
> room and left . . . We did not fight over my phone like I told
> everyone. I wanted it to look like I didn't do anything wrong.
> The police came shortly after that and that's when everything got
> out of hand. I know that Alan did not rape me and I want all this
> to end and be truthful about what happened that night.

Ex. Vol., p. 52.

[9] T.P. was deposed on October 27, 2017, in Jackson County. Present were Karenke's trial counsel and then-prosecutor AmyMarie Travis. T.P. said that she had moved in with the Hafner family on April 1 and had had no direct contact with Karenke since March 20. Regarding the events of March 19, T.P. said that she was "half asleep" when she saw Karenke come into her room and was "just kind of curious" what he would do. Ex. Vol., p. 24. She described how Karenke pulled down her leggings and underwear and that she "just let it happen" and was "pretending [to be] asleep." *Id.* at 24, 26 .[1] T.P. explained that she believed that Karenke thought she was asleep during the assault. *Id.* at 27. T.P. said that when she reached for her phone and made the screen light up, Karenke "freaked out and got up and said he was in the wrong room." *Id.* at 28. She said she did not say "stop" or yell for help, and that she texted her boyfriend when Karenke left the room. *Id.* at 28–29.

---

[1] We note that this exhibit in the Exhibit Volume contains several pages out of order. We cite to the page numbers inserted into the Exhibit Volume, not to the page numbers of the individual exhibits.

[10]     T.P. went on to describe the arrival of law enforcement, her escape out the bedroom window, and Karenke's standoff with the officers. She went on to reply:

> Q: Then what happened when the police got there?
>
> A: When the police got me out of the window I just told them a complete lie.
>
> Q: What did you —
>
> A: 'Cause I was scared. I didn't want my boyfriend to find out.
>
> Q : What did you tell them?
>
> A: I told them that [Karenke] raped me, that he gave me oral sex without my permission.
>
> Q: How is that a lie?
>
> A: Well, a lie because I said it was without my permission.

Ex. Vol., pp. 31–32.

[11]     During her deposition, in regard to her written statement she had submitted, T.P. denied that anyone, including her mother, asked her or forced her to write the statement and that it was factually accurate. Ex. Vol., p. 40. Prosecutor Travis subsequently cross-examined T.P. about the written statement:

Q: Do you remember meeting with me back around July 24th of 2017 at my office?

A: Yeah, I think so.

. . .

Q: And do you recall telling me that the things in this letter were not accurate?

A: Yes.

Q: And that your mother forced you to write them so that [Karenke] wouldn't get in trouble?

A: Yes.

. . .

Q: Okay. So it is your testimony here today that Mr. Karenke believed that you were asleep when he came [into] the room. You were acting asleep and he believed you were asleep is what you think. Is that correct?

A: Yes.

Ex. Vol., pp. 41, 43, 48.

[12] On July 24, 2018, Karenke filed a motion to waive his right to trial by jury. The trial court granted his motion on July 31. The State filed an amended charging information on January 10, 2019, dismissing the robbery charge and adding

Level 3 felony attempted rape. Upon Karenke's motion, the trial court continued the proceedings after the State amended the charges against Karenke.

[13] A bench trial was held on March 7, 2019. Before argument, the State dismissed the Class A misdemeanor interference with the reporting of a crime charge. The State's first witness was Robert Hager, an investigator with the Jackson County Prosecutor's Office. He testified to his attempts in late 2018 and early 2019 to locate and serve subpoenas on T.P. and her mother, Brenda. These efforts included visiting the Karenke residence in Jackson County; visiting their suspected residences in Monroe and Marion Counties; visiting their workplaces; contacting Tyler Hafner; and leaving contact information at various locations in an effort to induce T.P. or her mother to renew contact with the prosecutor's office. For his efforts, Hager spoke to T.P. just once on the phone, and T.P. informed him that she was in Colorado.

[14] Upon the State's request based on Hager's testimony and over Karenke's objection, the trial court found T.P. unavailable for purposes of serving as a witness as a result of her avoidance of process. The trial court admitted T.P.'s deposition into evidence in her stead. Then Tyler Hafner, T.P.'s boyfriend at the time of the incident, testified, and the trial court admitted into evidence the messages exchanged between T.P. and Hafner on the night of the attempted rape. The trial court also heard testimony from Jackson County law enforcement officials who responded to the scene and from crime lab analysts who processed samples that were collected from T.P. Finally, the trial court permitted, over Karenke's objection, former prosecutor and current Jackson

Circuit Court Judge AmyMarie Travis to testify; as prosecutor, Judge Travis had been assigned to T.P.'s case, had met with T.P. in July 2017, and had participated in T.P.'s deposition in October 2017.

[15] The trial court found Karenke guilty of Level 3 felony attempted rape, Level 6 felony criminal confinement, and Class A misdemeanor resisting law enforcement and entered judgment of conviction on the three counts. On May 6, 2019, the trial court held a sentencing hearing. For attempted rape, Karenke was sentenced to nine years in the DOC, with five years executed and four years suspended to probation. Karenke received concurrent one-year sentences for the criminal confinement and resisting law enforcement convictions. This appeal followed. Additional facts will be provided as necessary.

## Sixth Amendment Challenges

[16] Karenke argues that he was denied his constitutional right to a jury trial because the trial court permitted the State to amend its charging information after Karenke had waived the right. Karenke also argues that he was denied his constitutional right to confront witnesses because he was not present at T.P.'s deposition and because T.P. failed to appear at trial. We will address each constitutional challenge in turn.

### I.  Right to Jury Trial

[17] The Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution guarantee the right to trial by jury in all criminal prosecutions. *See* U.S. Const. amend. VI; Ind. Const. art. 1, § 13. When a

defendant is charged with a felony, the right to a jury trial is automatic and presumed unless the defendant affirmatively acts to waive the right. *Poore v. State*, 681 N.E.2d 204, 207 (Ind. 1997). A defendant may waive his right to a jury trial in the form of a written waiver or in a colloquy in open court. *Dixie v. State*, 726 N.E.2d 257, 260 (Ind. 2000); *Good v. State*, 267 Ind. 29, 32, 366 N.E.2d 1169, 1171 (Ind. 1977). It is fundamental error to deny a defendant a jury trial unless there is evidence of his knowing, voluntary, and intelligent waiver of the right. *Reynolds v. State*, 703 N.E.2d 701, 704 (Ind. Ct. App. 1999). Whether a defendant has waived the right to a jury trial is a question of law that we review de novo. *Horton v. State*, 51 N.E.3d 1154, 1157 (Ind. 2016).

[18] Karenke waived his right to a jury trial on July 27, 2018, by filing a verified motion to waive jury trial and accompanying affidavit. *See* Appellant's App. pp. 98–99. On appeal, Karenke does not dispute that this waiver complied with our "defendant-centric procedure" that requires waiver of jury trial be made orally or in writing by the defendant personally. *Horton*, 51 N.E.3d at 1158–59; *Kellems v. State*, 849 N.E.2d 1110, 1113–14 (Ind. 2016) (explaining that in felony prosecutions, waiver of the right to a jury trial under Indiana law is valid only if communicated personally by a defendant). Rather, Karenke argues that because he waived the right to a jury trial before the State amended its charging information, the trial court erred when it did not reacquire Karenke's waiver with respect to the additional felony charge. The State contends that Karenke's substantial rights suffered no prejudice and that the amended information was a change in form, not substance.

[19] The purpose of a charging information is to "provide a defendant with notice of the crime of which he is charged so that he is able to prepare a defense." *State v. Laker*, 939 N.E.2d 1111, 1113 (Ind. Ct. App. 2010), *trans. denied*. At any time before, during, or after trial, the court may, upon the State's motion, permit an amendment to the information with respect to "any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant." Ind. Code § 35-34-1-5(c); *see Davis v. State*, 714 N.E.2d 717, 721–22 (Ind. Ct. App. 1999), *trans. denied*. An amendment is a change in form when (1) "a defense under the original information would be equally available after the amendment" and (2) "the accused's evidence would apply equally to the information in either form." *Fajardo v. State*, 859 N.E.2d 1201, 1207 (Ind. 2007). An amendment is a change in substance only if it is "essential to making a valid charge of the crime." *Id.* (citing *McIntyre v. State*, 717 N.E.2d 114, 125–26 (Ind. 1999)); *Haak v. State*, 695 N.E.2d 944, 951 (Ind. 1998). Whether an amendment is a matter of form or substance is a question of law which we review de novo. *Blythe v. State*, 14 N.E.3d 823, 829 (Ind. Ct. App. 2014).

[20] The State initially charged Karenke with Level 3 felony rape, and Karenke waived his right to a jury trial on that offense. Its amended information charged Karenke with Level 3 felony attempted rape in addition to Level 3 felony rape. Factually, both offenses involve one instance of conduct with the same individual, T.P., on the night of March 19, 2017. Statutorily, both offenses require the same level of "knowing or intentional" culpability. I.C. § 35-42-4-1(a). The difference between the two offenses is that attempted rape requires

only that Karenke "engage[d] in conduct that constitutes a substantial step toward commission of the crime," in this case, toward the commission of rape. I.C. § 35-41-5-1. Thus, as it was charged against Karenke, attempted rape is an inherently lesser-included offense of rape, and the evidence underlying the offenses applies equally to the initial and amended charging information. *Cf. Young v. State*, 30 N.E.3d 719, 720 (Ind. 2015) (reversing conviction where defendant did not have fair notice of the lesser offense based on different "means used" than what was alleged in the charging information). The amended information did not preclude or negate defenses to rape that were available under the initial charging information; that is to say, any defense under the initial information was equally available to Karenke after the amendment. Therefore, the amendment was a change in form, not in substance.

[21] The question that follows is whether—by permitting the State to amend the charging information in form—the trial court caused prejudice to Karenke's substantial rights. These substantial rights include the right to notice and an opportunity to be heard and to contest the amendment. *Davis*, 714 N.E.2d at 721–22. In this case, after the State amended the information, the trial court granted Karenke's motion to continue the proceedings to give Karenke adequate time to prepare his defense to the amended charges. *See* Appellant's App. p. 115. Karenke indubitably had fair notice of the charges he needed to defend against. *See Young*, 30 N.E.3d at 723. Karenke's motion to continue also specifically referred to continuing a bench trial and did not include a request for hearing to challenge the amended charges. The bench trial was reset for March

7, 2019, and Karenke raised no objection to the State's amended information and proceeded to a bench trial. *See* Bench Trial Tr. p. 3. Given the opportunity to challenge the amendment, Karenke did not do so. Thus, Karenke's substantial rights were not prejudiced by the amendment, the trial court did not err by proceeding with a bench trial on the amended charges, and Karenke was not denied his Sixth Amendment right to a jury trial. *Cf. Tripp v. State*, 729 N.E.2d 1061, 1065–66 (Ind. Ct. App. 2000) (requiring trial court to afford defendant opportunity to "reevaluate his jury trial waiver" where amended information was a change in substance), *abrogated on other grounds by Fajardo v. State*, 859 N.E.2d 1201 (Ind. 2007).

## II. Right to Confront Witness

[22]     Karenke also claims that his confrontation right under the Sixth Amendment to the United States Constitution and under Article 1, Section 13 of the Indiana Constitution was violated because he was not present during T.P.'s deposition and because T.P. did not testify at his trial.[2] The State counters that Karenke exercised his right to confront the witness by taking T.P.'s deposition and actively participating in it, and thus there was no denial of Karenke's constitutional right to confront witnesses.

---

[2] Karenke also argues that T.P. did not identify him as the perpetrator of the offenses for which he was convicted at either the deposition or at trial. This point is more closely associated to Karenke's sufficiency of the evidence argument, which we address *infra*.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" This right of confrontation is made obligatory on the states by the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Brady v. State*, 575 N.E.2d 981, 985 (Ind. 1991). Similarly, Article 1, Section 13 of the Indiana Constitution provides a criminal defendant the right of confrontation: "[i]n all criminal prosecutions the accused shall have the right. . . to meet the witnesses face to face." Although the federal right of confrontation and the state right to a face-to-face meeting are co-extensive to a "considerable degree," the rights guaranteed by Article 1, Section 13 are not necessarily identical to those given by the Sixth Amendment. *Brady v. State*, 575 N.E.2d at 987. They have been interpreted to encompass two distinct components: meeting witnesses face-to-face and cross-examination. *Id.*

First, we address Karenke's confrontation claim under the Sixth Amendment. The essential purpose of the Sixth Amendment right of confrontation is to ensure that the defendant has the opportunity to cross-examine the witnesses against him. *State v. Owings*, 622 N.E.2d 948, 950 (Ind. 1993). Our supreme court has recognized that the right to adequate and effective cross-examination is fundamental and essential to a fair trial. *Id.*

Karenke does not dispute that his attorney was present at T.P.'s deposition—it was on his motion that T.P. was deposed—and questioned T.P. According to the transcript of the deposition, Karenke's counsel thoroughly walked through the events of March 19 and March 20, 2017, as well as relevant events before

and after that night, in anticipation of the charge of Level 3 felony rape that Karenke faced. These facts demonstrate that there was sufficient opportunity for examination and cross-examination and thus no deprivation of Karenke's Sixth Amendment right to cross-examine T.P. *See Berkman v. State*, 976 N.E.2d 68, 77–78 (Ind. Ct. App. 2012) (observing that, to the extent the defendant did not exercise his right to attempt to undermine adverse witness testimony, it was not because the defendant was denied the opportunity to do so), *trans. denied*.

[26] Next, we address Karenke's confrontation claim under Article 1, Section 13 of the Indiana Constitution. The right of a criminal defendant to confront the witnesses against him is "an individual privilege relating to the procedure at trial and, therefore, may be waived." *Owings*, 622 N.E.2d at 952. For a waiver to be effective, there must be "an intentional relinquishment or abandonment of a known right or privilege." *Phillips v. State*, 543 N.E.2d 646, 648 (Ind. 1989). The determination of whether a defendant has waived a constitutional right depends on the circumstances of the particular case, including the conduct of the defendant. *Id.*

[27] A defendant may waive his right to confrontation by intentionally relinquishing or abandoning it "by word or deed." *Owings*, 622 N.E.2d at 952. Where there is no showing in the record that a defendant is unable to attend a deposition and he makes no objection to it proceeding, the defendant waives his right to confrontation even if the witness is unable to testify at trial. *Coleman v. State*, 546 N.E.2d 827, 830 (Ind. 1989). Further, where counsel for the defendant takes the deposition of a witness and actively participates in that deposition, the

defendant is "deemed to have waived his right of confrontation at trial." *Owings*, 622 N.E.2d at 952.

[28] Here, it was on Karenke's petition that defense counsel deposed T.P. in October 2017 at the Jackson County courthouse; counsel participated by questioning T.P. on the events of March 19 and 20 of that year. *See* Ex. Vol., pp. 5–51. There is no showing in the record that Karenke did not have the ability to attend the deposition in Jackson County if he wished to, nor did Karenke's counsel object to proceeding with the deposition in Karenke's absence. Because the deposition was taken on Karenke's behalf and because defense counsel actively participated, Karenke has exercised his confrontation right under Article 1, Section 13 of the Indiana Constitution and therefore waived claim of error for our review.

[29] In regard to the admission of T.P.'s deposition into evidence at trial, the rule is that admission of prior testimony at a subsequent proceeding violates the constitutional right of confrontation *if* a defendant has never had the opportunity to cross-examine a witness and meet her face to face. *Brady*, 575 N.E.2d at 989. Having determined that Karenke was not denied the opportunity to cross-examine T.P., we now consider whether the trial court erred in admitting her deposition testimony in her absence at Karenke's bench trial. The decision whether to admit former testimony of an unavailable witness is within the sound discretion of the trial court. *Rhea v. State*, 814 N.E.2d 1031, 1033 (Ind. Ct. App. 2004), *trans. denied*. Its decision will not be reversed absent

a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Guy v. State*, 755 N.E.2d 248, 252 (Ind. Ct. App. 2001), *trans. denied*.

[30] The standard for determining whether the admission of a hearsay statement against a criminal defendant violates the right of confrontation was modified in *Crawford v. Washington*, 541 U.S. 36, 59 –60 (2004). In *Crawford*, the Supreme Court clarified that "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* Indiana courts recognize the rule that prior testimony from a subsequently unavailable witness is admissible provided that the defendant had the opportunity to confront the witness when the testimony was originally given. *Ingram v. State*, 547 N.E.2d 823, 826 (Ind. 1989) (deposition testimony); *Coleman*, 546 N.E.2d at 829–30 (deposition testimony).

[31] The remaining question is whether T.P. was indeed unavailable as a witness at the March 7, 2019, bench trial. A witness is unavailable for purposes of the confrontation clause requirement only if the prosecution has made a good faith effort to obtain the witness's attendance at trial. *Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002). Here, the State demonstrated a good faith effort to produce T.P. as a witness at trial. The prosecution's efforts pre-dated Karenke's trial and lasted months: Investigator Robert Hager testified that he searched for T.P. online; contacted her extended family members; traveled outside Jackson County; and traveled to her biological father's last-known address, all in an effort to locate T.P. *See* Bench Trial Tr. pp. 16–22. Hager spoke to T.P. on the

telephone one time; T.P. indicated that she was out of state, and Hager apparently concluded from this that T.P. did not intend to make herself available as a witness in Karenke's trial. Being mindful of the trial court's discretion in this area, we find no abuse in the trial court's finding that T.P. was unavailable as a witness for purposes of determining whether her prior testimonial statements could be admitted at trial without violating the confrontation clause.

# Evidentiary Challenges

[32]     Karenke argues that the trial court fundamentally erred in allowing into evidence the Facebook Messenger and text messages between T.P. and her boyfriend. He also argues it was fundamental error to allow Judge Travis to testify as to her role prosecuting the case because she has since been elevated to the bench in Jackson County. And, Karenke argues that it was fundamental error to admit jail telephone call recordings. Karenke asserts that, as a whole, the evidence presented was insufficient to prove beyond a reasonable doubt that he was guilty of attempted rape, resisting law enforcement, and criminal confinement. We now address Karenke's evidentiary challenges in turn.

## I.    Admission of Evidence

[33]     A trial court's decision regarding the admission of evidence is squarely within that court's discretion, and we afford it great deference on appeal. *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). We will not reverse such a decision unless it is clearly contrary to the logic and effect of the facts and circumstances

of the case or misinterprets the law. *Id.* Even where a trial court abused its discretion by admitting or excluding inadmissible evidence, we will not overturn a conviction if the evidentiary error is harmless. *Griffith v. State*, 31 N.E.3d 965, 969 (Ind. 2015). An error is harmless if "the probable impact of the evidence upon the [factfinder] is sufficiently minor so as not to affect a party's substantial rights." *Id.* And, in criminal bench trials, "we presume that the court disregarded inadmissible testimony and rendered its decision solely on the basis of relevant and probative evidence." *Helton v. State*, 624 N.E.2d 499, 513 (Ind. Ct. App. 1993), *trans. denied*.

[34] The trial court admitted into evidence screenshots of Facebook Messenger and text message conversations between T.P. and Tyler Hafner from the night of March 19 and early March 20, 2017. The basis for their admission was that the messages were present sense impressions and/or excited utterances, and thus exceptions to the evidentiary prohibition against hearsay. *See* Ind. Evidence Rule 803(1) and (2). On appeal, Karenke argues that their admission constituted an abuse of discretion for a variety of reasons, but primarily because T.P., as the declarant, was not available as a witness at trial. The present sense impression and excited utterance exceptions to hearsay, however, are available "regardless of whether the declarant is available as a witness." Evid. R. 803. Thus, the trial court did not abuse its discretion in admitting the messages in accordance with the Indiana Rules of Evidence, and we decline to address Karenke's further arguments alleging error in their admission.

[35]   Karenke also argues that by permitting the State to call Jackson Circuit Court Judge Travis—formerly the prosecutor assigned to Karenke's case—as a witness, the trial court abused its discretion. He contends that Judge Travis violated the Indiana Code of Judicial Conduct by failing to act in a manner that "promotes public confidence in the independence, integrity, and impartiality of the judiciary[.]" Ind. Judicial Conduct Rule 1.2. Because Karenke did not base his objection to Judge Travis's testimony on this rationale at the time, he has waived the argument for our review on appeal. *See Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Waiver notwithstanding, Judge Travis did not violate her ethical duty to "avoid impropriety or the appearance of impropriety." Jud. Cond. R. 1.2. To the contrary: that a small county's prosecutor would be elevated to the bench, necessarily terminating her involvement in ongoing criminal prosecutions, is a reasonably foreseeable possibility. Judge Travis limited her testimony to her professional assessment of T.P.'s demeanor during a pre-trial interview. Bench Trial Tr. pp. 118–131. Absent persuasive evidence that admission of this testimony was against the logic and effect of the facts and circumstances of this case, we decline to find an abuse of discretion on the trial court's part in admitting Judge Travis's testimony.

[36]   Finally, Karenke challenges the admission of four recorded jail calls between himself and T.P.'s mother, Brenda, that occurred between March 20 and March 22, 2017, because the witness through whom the records were offered "did not have personal knowledge as a custodian." Appellant's Amended Br. at 32. The State maintains that the trial court properly admitted the calls as records of

regularly conducted activity, which constitute an exception to hearsay under Evidence Rule 803(6). We agree. The records of the calls were made at or near the time from information transmitted by someone with knowledge of an act: here, by Karenke, within two days of his arrest. At trial, Deputy Benjamin Rudolph testified that the telephone calls are recorded and maintained in the regular course of the jail's business. Bench Trial Tr. pp. 87–89. He testified to the procedure used to identify and record the caller and verified that the telephone calls were "true and accurate copies of the recordings under Alan Karenke's name[.]" *Id.* Furthermore, Deputy Rudolph testified intelligently about and with personal knowledge of the procedures used to record the telephone calls, making him a "qualified witness" as to the records of regularly conducted activities under Evidence Rule 803(6)(D). The telephone calls were properly admitted as an exception to the prohibition against hearsay and did not constitute an abuse of discretion by the trial court.

## II. *Sufficiency of Evidence*

[37] Karenke's second evidentiary challenge is that the totality of the evidence is insufficient to support his convictions for attempted rape, criminal confinement, and resisting law enforcement. When reviewing a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003). We look only to the probative evidence supporting the judgment and the reasonable inferences that may be drawn from that evidence to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* Reversal is

only appropriate when no reasonable trier of fact could find the elements of the crime proven beyond a reasonable doubt. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007).

[38] Here, Karenke was convicted of attempted rape, which required the State to prove Karenke knowingly or intentionally engaged in conduct that constituted a substantial step toward the commission of the offense of rape. *See* I.C. § 35-41-5-1; *Tatum v. State*, 485 N.E.2d 138, 139 (Ind. Ct. App. 1985), *trans. denied*. "A substantial step is any overt act beyond mere preparation and in furtherance of the intent to commit the offense." *Newville v. State*, 983 N.E.2d 602, 605 (Ind. Ct. App. 2013). Rape is committed when a person "knowingly or intentionally causes another person to submit to other sexual conduct when the other person is unaware that the other sexual conduct is occurring." I.C. § 35-42-4-1(a)(2). "Other sexual conduct" encompasses oral sex. I.C. § 35-31.5-2-221.5(1).

[39] Karenke does not dispute that near midnight on March 19, 2017, he entered T.P.'s room, partly removed her leggings and underwear, and briefly acted to cause T.P. to submit to oral sex while she was either asleep or pretending to be asleep. From this evidence, the trial court reasonably concluded that Karenke took these actions in the belief that T.P. was asleep, that is to say, believing she was unaware that the sexual conduct was occurring. Thus, the State proved that Karenke committed attempted rape by acting with the required culpability and taking a substantial step toward completing rape; the evidence sufficiently supports Karenke's conviction for attempted rape. Additionally, Karenke disputes that T.P. ever identified him as the perpetrator of the offense. We

disagree. During her deposition, T.P. described living with her mother, siblings, and Karenke, and then T.P. identified Karenke as the person who entered her bedroom while she slept on the night of March 19. Ex. Vol., p. 24.

[40] Karenke's conviction for criminal confinement required the State to prove that he "knowingly or intentionally confine[d] another person without the other person's consent." I.C. § 35-42-3-3(a). The evidence presented, especially by Officer Hutchinson, established that Karenke prevented T.P. from leaving the house shortly after midnight on March 20, 2017. Officer Hutchinson described circling T.P.'s house after determining that Karenke was refusing to exit and that the reported victim, T.P., and her minor siblings might be at risk inside. He quickly discovered T.P. leaning out of her bedroom window, looking "scared" that "somebody was going to be entering the room." Bench Trial Tr. p. 49. His account corroborates T.P.'s deposition testimony, in which she described being ready to jump out of the window at the moment Officer Hutchinson arrived to pull her to safety. And, T.P.'s contemporaneous messages to her boyfriend described Karenke not "let[ting] [her] go" and threatening to "chase after" her if she did. Ex. Vol., pp. 64–66. This evidence sufficiently supports Karenke's conviction for criminal confinement; his argument otherwise is simply a request to reweigh evidence, which we decline to do.

[41] Similarly, the evidence presented was sufficient to support Karenke's conviction for resisting law enforcement. This offense required the State to prove that Karenke "knowingly or intentionally forcibly resist[ed], obstruct[ed], or interfere[d] with a law enforcement officer . . . while the officer is lawfully

engaged in the execution of the officer's duties." I.C. § 35-44.1-3-1(a)(1). The testimony of Jackson County law enforcement was that Karenke's evasive actions required them to engage in a "stand-off" for over an hour in the early hours of March 20, 2017. Karenke in fact resisted arrest and obstructed officer attempts to do so to the extent that he required tasering through an open window of the house. Only then did Karenke emerge from the house; then, officer testimony was that "[i]t took strength to put [Karenke's] hands behind his back," and Karenke forcibly resisted allowing himself to be handcuffed. Bench Trial Tr. pp. 57–58. The force needed to sustain a conviction for resisting law enforcement "need not rise to the level of mayhem," and thus we find the evidence of Karenke's evasive actions sufficient to support his conviction for the offense. *See Stansberry v. State*, 954 N.E.2d 507, 510 (Ind. Ct. App. 2011).

## Double Jeopardy

[42] Karenke argues that his convictions for criminal confinement and attempted rape violate the constitutional prohibitions against double jeopardy and thus his conviction for criminal confinement must be vacated. The Fifth Amendment of the United States Constitution provides that no person will "be subject for the same offence to be twice put in jeopardy of life or limb." Article 1, Section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." The effect of both constitutional provisions is the prohibition of multiple convictions where there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a

second challenged offense." *Richardson v. State*, 717 N.E.2d 32, 53 (Ind. 1999). Our review of claims of double jeopardy is de novo. *Spears v. State*, 735 N.E.2d 1161, 1166 (Ind. 2000).

[43] Karenke's convictions required actual evidence of the following: for attempted rape, proof of a substantial step toward causing another person to perform or submit to other sexual conduct when the other person is unaware that the sexual intercourse or other sexual conduct is occurring. *See* I.C. §§ 35-41-5-1; 35-42-4-1(a)(2). For criminal confinement, proof of nonconsensual, substantial interferences with a person's liberty is required. *See* I.C. §§ 35-42-3-1; 35-42-3-3. Karenke does not claim that his convictions violate the statutory elements test; rather, he claims that his convictions run afoul of the actual evidence test requiring that we examine the actual evidence presented at trial "to determine whether each challenged offense was established by separate and distinct facts." *Richardson*, 717 N.E.2d at 53. That is to say, Karenke must demonstrate a reasonable possibility that "the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id.* If the evidentiary facts underpinning the elements of one offense do not establish all of the elements of the second offense, the convictions are not violative of the double jeopardy clause. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008).

[44] The evidence relied upon to prove attempted rape consists of Karenke entering T.P.'s room while he believed she was asleep, partly disrobing T.P., and causing T.P. to submit to sexual conduct, specifically to oral sex. The State also

relied on T.P.'s medical records, the DNA collected during her sexual assault exam, and T.P.'s messages to her boyfriend in the immediate aftermath of the attempted rape to establish that she "awoke to her stepfather giving her oral sex." Ex. Vol., p. 90. The evidence relied upon to prove criminal confinement consists of T.P.'s messages to her boyfriend in the immediate aftermath of the attempted rape that Karenke would not "let [her] go"; that she feared Karenke would impede her ability to communicate by shutting off her cell phone's data service; and that he would "chase after" T.P. if she left, as her boyfriend urged her to do. Ex. Vol, pp. 64–66. The State also relied on Officer Hutchinson's testimony that he encountered T.P. in her bedroom window and helped her exit the house that way, because Karenke made her unable to leave through the bedroom door.

[45] The State relied upon independent evidentiary facts to prove Karenke's was guilty of attempted rape and criminal confinement. Karenke's case is distinguishable from *Griffin v. State*, where the trial court unconstitutionally relied upon the same evidentiary fact—the defendant pinning his victim down—to prove both forcible attempted rape and confinement. 583 N.E.2d 191, 195 (Ind. Ct. App. 1991). Here, the evidence was that Karenke interfered with T.P.'s liberty by confining her to her room without T.P.'s consent in the aftermath of the attempted rape, not during the course of the attempted rape. Accordingly, the *Griffin* court's application of the actual evidence test does not afford relief as applied to the evidentiary facts of this case. Karenke's

convictions for attempted rape and criminal confinement do not violate the actual evidence test and Karenke was not subject to double jeopardy.

## Inappropriate Sentence

[46] Finally, Karenke contends that his nine-year sentence in the DOC is inappropriate in light of the nature of his offenses and his character as an offender. Karenke was sentenced to an aggregate sentence of nine years for his crimes: Level 3 felony attempted rape, Level 6 felony criminal confinement, and Class A misdemeanor resisting law enforcement. The sentencing range for his most serious offense, attempted rape, is three to sixteen years of imprisonment, with the advisory sentence being nine years. *See* I.C. § 35-50-2-5(b).

[47] Article 7, Sections 4 and 6 of the Indiana Constitution authorize "independent appellate review and revision of a sentence imposed by the trial court." *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007). This appellate authority is exercised through Appellate Rule 7(B). Revision of a sentence under the rule requires the defendant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. *See* App. R. 7(B); *Norris v. State*, 113 N.E.3d 1245, 1255 (Ind. Ct. App. 2018). Indiana's flexible sentencing scheme allows trial courts to tailor appropriate sentences based on the circumstances presented; accordingly, the trial court's judgment should receive "considerable deference," and our role upon appellate review is to attempt to "leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1224–25 (Ind. 2008).

[48] Karenke bears the burden of persuading us that his sentence is inappropriate and requires revision as an outlier. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). And because Karenke received the advisory sentence for his most serious offense, the burden is "particularly heavy." *Frenbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), *trans. denied*. While the advisory sentence is the starting point for our review, we also assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Johnson v. State*, 986 N.E.2d 852, 856 (Ind. Ct. App. 2013); *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006).

[49] Karenke contends that the nature of his offense warrants a sentencing revision. When considering the nature of the offenses, we consider "the details and circumstances" of the crimes. *Washington v. State*, 940 N.E.2d 1220, 1222 (Ind. Ct. App. 2011), *trans. denied*. By committing attempted rape and criminal confinement of T.P., his stepdaughter, Karenke violated a position of trust and authority; this circumstance alone is a valid aggravating factor that would have justified the trial court's imposition of a maximum sentence. *See Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018) (maximum sentence upheld where defendant violated position of trust), *trans. denied*; *Baumholser v. State*, 62 N.E.3d 411, 417 (Ind. Ct. App. 2016) (explaining that abusing a position of trust is a valid aggravator which, alone, may support a maximum sentence), *trans. denied*.

[50] Karenke committed attempted rape of 18-year-old T.P. late at night, when he believed T.P. was asleep, and when the rest of the family was in other rooms of

the home. When Karenke realized T.P. was not asleep, he prevented her from leaving her room to seek help, forcing T.P. to escape through a window. Karenke then engaged in a prolonged stand-off with law enforcement which required the deployment of a taser to apprehend him. "The fact of multiple victims or crimes . . . constitutes a valid aggravating factor." *O'Connell v. State*, 742 N.E.2d 943, 952 (Ind. 2001). This sequence of events contains no compelling evidence of restraint in the commission of the crimes of attempted rape, criminal confinement, and resisting law enforcement, nor evidence that otherwise casts the offenses in a better light. We do not assess that Karenke's sentence—which is within the statutory boundaries—is too harsh based on the nature of the crimes he committed.

[51] Karenke also contends that the trial court abused its discretion in finding no mitigating factors in his character. He cites his employability; the support of family members; the hardship of incarceration on his family members; and his compliance during the instant proceedings as warranting revision of his sentence. The State points out that Karenke's criminal history demonstrates continued disregard for police authority and a failure to remediate his behavior given opportunities to do so. Criminal history is one factor in considering the character of an offender. *Pelissier v. State*, 122 N.E.3d 983, 990 (Ind Ct. App. 2019), *trans. denied.* The trial court imposed the advisory sentence for Level 3 felony attempted rape, nine years, and ordered the sentences for Level 6 felony criminal confinement and Class A misdemeanor resisting law enforcement to run concurrently. We are cognizant, too, that the trial court suspended four

years of Karenke's nine-year sentence despite not finding any mitigating factors. The resulting five-year executed sentence is at the lower end of the statutory boundaries for a Level 3 felony; thus, we conclude that Karenke has not met his burden of convincing this court that the trial court abused its discretion in its sentencing of Kerenke.

## Conclusion

[52] For all of these reasons, we hold that Karenke was not denied any of his constitutional rights. Also, the trial court did not abuse its discretion in any of its rulings on the admission of evidence. Sufficient evidence supported his convictions, and his sentence was not inappropriate. Accordingly, his convictions for attempted rape, criminal confinement, and resisting law enforcement are affirmed, as is his nine-year sentence for those offenses.

[53] Affirmed.

Kirsch, J., and Bailey, J., concur.